FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BRIAN NEWTON, an individual,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>PARKER DRILLING MANAGEMENT<br>SERVICES, LTD., Erroneously Sued<br>As Parker Drilling Management<br>Services, Inc.,<br>*Defendant-Appellee*,<br><br>and<br><br>PARKER DRILLING MANAGEMENT<br>SERVICES, INC., a Nevada<br>Corporation,<br>*Defendant.* | No. 15-56352<br><br>D.C. No.<br>2:15-cv-02517-<br>RGK-AGR<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted March 7, 2017
Pasadena, California

Filed February 5, 2018

Before: Richard A. Paez, Marsha S. Berzon,
and Morgan Christen, Circuit Judges.

Opinion by Judge Christen

---

## SUMMARY[*]

---

### Labor Law

The panel vacated the district court's dismissal on the pleadings of California wage and hour claims brought by workers employed on drilling platforms fixed on the Outer Continental Shelf.

The Outer Continental Shelf Lands Act provides that the laws of the adjacent state are to apply to drilling platforms fixed to the seabed of the Outer Continental Shelf as long as state law is "applicable" and "not inconsistent" with federal law.  The panel held that California's minimum wage and overtime laws are not inconsistent with the Fair Labor Standards Act, which establishes a national floor under which wage protections cannot drop.  The panel therefore vacated the dismissal of these claims.

In addition, the panel vacated the dismissal of claims brought pursuant to California's meal period, final pay, and pay stub laws, and instructed the district court to determine on remand whether these laws are "not inconsistent" with existing federal law.  The panel also vacated claims under

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

California's Private Attorney General Act and Unfair Competition Law, and it remanded the case for further proceedings.

---

## COUNSEL

Michael Strauss (argued), Strauss & Strauss APC, Ventura, California, for Plaintiff-Appellant.

Ronald J. Holland (argued), Ellen M. Bronchetti, and Karin Dougan Vogel, Sheppard Mullin Richter & Hampton LLP, San Francisco, California, for Defendant-Appellee.

---

## OPINION

CHRISTEN, Circuit Judge:

This case presents the novel question whether claims under state wage and hour laws may be brought by workers employed on drilling platforms fixed on the outer Continental Shelf. Brian Newton worked on such a platform off the coast of Santa Barbara. His shifts lasted fourteen days and he regularly worked twelve hours per day. After Parker Drilling ("Parker") terminated him, Newton sued in state court for wage and hour violations under California law. Parker removed the case to federal district court and filed a motion for judgment on the pleadings. The district court granted the motion, concluding that the Fair Labor Standards Act is a comprehensive statutory scheme that is exclusive of California wage and hour laws. Newton appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291.

4        NEWTON V. PARKER DRILLING MGMT. SERVS.

We hold that the absence of federal law is not, as the district court concluded, a prerequisite to adopting state law as surrogate federal law under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a)(2)(A). We thus reject the proposition that "necessity to fill a significant void or gap," *Cont'l Oil Co. v. London S.S. Owners' Mut. Ins. Ass'n*, 417 F. 2d 1030, 1036 (5th Cir. 1969), is required in order to assimilate "applicable and not inconsistent," 43 U.S.C. § 1333(a)(2)(A), state law into federal law governing drilling platforms affixed to the outer Continental Shelf. We therefore vacate the district court's dismissal of Newton's claims and remand for further proceedings consistent with this opinion.

## I. FACTUAL & PROCEDURAL BACKGROUND

Newton worked as a roustabout and painter for Parker on drilling platforms in the Santa Barbara Channel from approximately January 2013 to January 2015. It is uncontested that the drilling platforms where he worked were located more than three miles offshore and fixed to the seabed of the outer Continental Shelf. His fourteen-day shifts, known in the industry as "hitches," comprised twelve hours on duty followed by twelve hours on "controlled standby." Newton was paid for twelve hours of work per day and he was not able to leave the platform during his shifts. Newton alleges that he usually took fifteen to thirty minutes during his shifts to eat without clocking out or ate while not working and remaining on call, and that Parker did not provide thirty-minute meal periods for each five hours worked, as required by California law. Parker paid Newton twice per month. In addition to compensation for twelve hours per day, his pay stubs showed pay for "two hours for the boat ride out, back and debriefing with the next crew."

Newton filed a putative class action in California state court on February 17, 2015.  Although Parker paid an hourly rate well above California and federal minimum wage, Newton maintained that California law required Parker to pay him for the twelve hours he was on controlled standby each day.  The First Amended Complaint (FAC) alleged that Newton's final paycheck did not include all the wages owed to him, "including the overtime/doubletime and meal period wages."  In all, Newton brought seven causes of action under California law for: (1) minimum wage violations; (2) failure to pay overtime and doubletime; (3) pay stub violations; (4) failure to pay timely final wages; (5) failure to provide lawful meal periods; (6) civil penalties under the Private Attorney General Act of 2004 (PAGA); and (7) unfair competition.

Parker removed the action to federal court and filed a motion for judgment on the pleadings.  Parker argued that, under the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356b (OCSLA), the Fair Labor Standards Act (FLSA) is a comprehensive statutory scheme that leaves no room for state law to address wage and hour grievances arising on the OCS.[1]  For his part, Newton contended that California's more protective wage and hour laws may be applied concurrently with the minimum guarantees of their federal counterpart.  *See* 29 U.S.C. § 201, *et seq*.  Newton's opposition did not explain the complaint's allegation that some of Parker's allegedly unlawful conduct occurred in California rather than on the OCS, but did request that if the

---

[1] We collectively refer to the outer Continental Shelf and the devices attached to it for the purposes enumerated in the statute as "the OCS."

district court were to grant Parker's motion, it do so "without prejudice to allow Plaintiff to correct any deficiencies."[2]

The district court granted Parker's motion for judgment on the pleadings, reasoning that "under [the] OCSLA, federal law governs and state law only applies to the extent it is necessary 'to fill a significant void or gap' in federal law." Finding no significant voids or gaps in the FLSA, the district court held that Newton could not invoke California wage and hour laws as surrogate federal law. The district court reached this decision after considering the Department of Labor (DOL) regulations elaborating the FLSA. While recognizing that the FLSA has a savings clause that expressly allows for more protective state minimum wage and overtime laws, the district court nevertheless concluded that California wage and hour claims were unavailable to Newton. The district court did not address Newton's request for leave to amend. Newton timely appealed.

## II.  STANDARD OF REVIEW

A dismissal on the pleadings pursuant to Rule 12(c) is reviewed *de novo*. *Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 883 (9th Cir. 2011). "Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Thinket*

---

[2] The FAC alleged, without elaboration, that "the unlawful employment practices complained of herein occurred in the City of Goleta, California, County of Santa Barbara." On appeal, Newton argues that "at least some of the alleged California wage-and-hour violations took place on vessels to and from California's coast and on the coast of California."

*Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004).

## III.  DISCUSSION

Except for any claims that may have arisen while Newton was transiting to and from the offshore drilling platforms where he worked, Newton's grievances relate to his employment on the OCS, and the parties agree that the fate of Newton's appeal rests on the OCSLA's choice of law provision.  *See* 43 U.S.C. § 1333(a)(2)(A).

## A.  The Outer Continental Shelf Lands Act

### 1.  OCSLA's Choice of Law Provision

The outer Continental Shelf generally refers to submerged lands lying more than three miles offshore, outside the territorial jurisdiction of the states.  *See* 43 U.S.C. §§ 1331(a), 1301(a)(2); *Valladolid v. Pac. Operations Offshore, LLP*, 604 F.3d 1126, 1130 (9th Cir. 2010).  Subject to certain exceptions and conditions, the OCSLA declares that the Constitution and laws of the United States extend to the outer Continental Shelf, as well as "*all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed* . . .  for the purpose of exploring for, developing, or producing resources therefrom . . . to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State."  43 U.S.C. § 1333(a)(1) (emphasis added).   OCSLA's assertion of jurisdiction is unique because it comprises the ocean floor but not the waters above it.  "[T]he jurisdiction asserted is a 'horizontal jurisdiction' and does not affect the status of superjacent waters."  Warren M. Christopher, *The*

*Outer Continental Shelf Lands Act: Key to a New Frontier*, 6 Stan. L. Rev. 23, 34 (1953) (citing S. Rep. No. 83-411, at 2 (1953)).  The OCSLA's choice of law provision declares:

> To the extent that they are *applicable and not inconsistent* with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, *the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf*, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area.

43 U.S.C. § 1333(a)(2)(A) (emphasis added).  Because the OCSLA makes plain that the laws of the adjacent state are to apply to drilling platforms fixed to the seabed of the outer Continental Shelf as long as state law is "applicable and not inconsistent with . . . Federal laws," the parties' dispute turns on the interpretation of the terms "applicable" and "not inconsistent." *Id.*

The Supreme Court has not been called upon to decide a case involving wage and hour laws on the OCS.  Both Newton and Parker ask us to look to the Fifth Circuit's interpretation of the OCSLA for guidance.  Though the

parties disagree as to the Fifth Circuit's prevailing test for choice of law on the OCS, they both argue that we ought to follow the Fifth Circuit's lead and adopt the approach it has taken in cases involving injury, wrongful death, and contract claims arising on the OCS.   Newton urges that the Fifth Circuit's test is the one set out in *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043 (5th Cir. 1990) (*PLT*).   According to Newton, platform workers may bring state wage and hour claims to the extent that state law is not inconsistent with existing federal law, *see Breton Energy, L.L.C. v. Mariner Energy Res., Inc.*, 764 F.3d 394, 398 (5th Cir. 2014), and California's wage and hour laws are not inconsistent with the FLSA insofar as they are preserved by the FLSA's savings clause.   Relying on *Continental Oil*, 417 F.2d at 1036, Parker argues that the FLSA is a comprehensive statutory and regulatory scheme that leaves no voids or gaps for state law to fill, so state wage and hour laws do not apply on the OCS and Newton's grievances may be redressed only by the FLSA.

Having examined the text of the original OCSLA and its 1975 amendment, the legislative history, and the Supreme Court's case law addressing the Act, we hold that state wage and hour laws are adopted as surrogate federal law on the OCS as long as they are "applicable and not inconsistent" with existing federal law.

## 2.  Origins of the OCSLA

"The OCSLA grew out of a dispute, which first developed in the 1930's, between the adjacent States and the Federal Government over territorial jurisdiction and ownership of the OCS and, particularly, the right to lease the submerged lands for oil and gas exploration."  *Shell Oil Co. v. Iowa Dep't of*

*Revenue*, 488 U.S. 19, 26 (1988).  Passed in 1953,"[t]he purpose of the [OCSLA] was to define a body of law applicable to the seabed, the subsoil, and the fixed structures such as [drilling platforms] on the outer Continental Shelf." *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 355 (1969).

Congress initially considered extending maritime law to the OCS, but it envisioned that 10,000 or more people might eventually be employed on the OCS to develop mineral resources.[3]  *See* 99 Cong. Rec. 6963–64 (1953); *Shell Oil*, 488 U.S. at 27 n.8.  Anticipating a broad range of activity associated with this mineral resource development, Congress feared that federal law, standing alone, would be inadequate because it "was never designed to be a complete body of law in and of itself."  99 Cong. Rec. 6963 (1953).  Congress also rejected the incorporation of the OCS into the boundaries of the several states, *see* S. Rep. No. 83-411, at 6 (1953), deciding instead that existing federal law and the law of the abutting state (except for state taxation laws)[4] were to comprise the body of law governing the OCS.  Because the Department of Justice and several members of Congress voiced concerns that the prospective incorporation of state laws on the OCS might be an unconstitutional delegation of Congress's legislative authority, S. Rep. No. 83-411, at 33

---

[3] "[L]arge crews of men will work on the miraculous structures which will rise from the sea bed of the outer Continental Shelf.  These men will die, leave wills, and pay taxes.  They will fight, gamble, borrow money, and perhaps even kill.  They will bargain over their working conditions and sometimes they will be injured on the job.  . . . the whole circle of legal problems familiar to the upland could occur on these structures." Christopher, *supra*, at 37.

[4] 43 U.S.C. § 1333(a)(2)(A) provides:  "State taxation laws shall not apply to the outer Continental Shelf."

(1953); *see* 99 Cong. Rec. 6963–64 (1953), the OCSLA only borrowed state law then in existence.[5] Thus, as originally adopted in 1953, "applicable" state law for purposes of § 1333(a)(2)(A) referred to state non-tax law, in existence on the effective date of the Act, that bore on the relevant subject matter.

The "applicable" state law for purposes of § 1333(a)(2)(A) changed in 1975 when Congress enacted the Deepwater Port Act, 33 U.S.C. §§ 1501, *et seq*., and simultaneously amended the OCSLA, *see* Pub. L. No. 93-627, § 19(f), 88 Stat. 2176 (1975). By then, *United States v. Sharpnack*, 355 U.S. 286 (1958), had allayed the concern that the prospective adoption of state law might amount to an unconstitutional delegation of congressional legislative authority.[6] The 1975 amendment redefined state law in

---

[5] As explained by Senator Cordon while introducing the bill to the Senate: "The enactment as Federal law by reference of the laws of the several abutting States meets the major constitutional objection, in that the laws so adopted are the laws as they exist at the time of the enactment of S. 1901. Only already existing State laws will become the law of the United States, and the amendatory legislation by the States thereafter will not be applicable, unless made so by later Federal legislation." 99 Cong. Rec. 6963–64 (1953); *see also* Christopher, *supra*, at 42.

[6] In *Sharpnack*, the Supreme Court sustained the Assimilative Crimes Act of 1948 (Crimes Act) against the challenge that Congress, in enacting the Crimes Act, impermissibly delegated its legislative authority to the states. 18 U.S.C. § 13; 355 U.S. at 286. The Crimes Act makes the version of state law enforceable at the time of allegedly unlawful conduct applicable, in conjunction with federal criminal law, on federal enclaves. *Sharpnack* explained that Congress's "deliberate continuing adoption" of state criminal law for federal enclaves does not rise to an unconstitutional delegation of legislative authority to the states because Congress always has the power to exclude a state law from the scope of the Crimes Act. 355 U.S. at 294.

§ 1333(a)(2)(A) as "the civil and criminal laws of each adjacent State, now in effect *or hereafter adopted, amended, or repealed*." § 1333(a)(2)(A) (emphasis added). This amendment ensured that the same law governed resource development structures on the OCS and deep water ports.[7] The OCSLA's choice of law provision has not undergone significant statutory amendments since 1975.

### 3.  Judicial Interpretation of the OCSLA

The Supreme Court first applied the OCSLA's choice of law provision in *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 355 (1969). The families of two workers who perished on drilling rigs fixed to the outer Continental Shelf off the Louisiana coast brought claims pursuant to Louisiana state law and the Death on the High Seas Act (High Seas Act). 395 U.S. at 352–53 (1969); *see* 46 U.S.C. §§ 30301–08. The High Seas Act provides an admiralty remedy for deaths resulting from traditional maritime activity on the high seas, i.e., in waters three or more nautical miles from shore. *See Rodrigue*, 395 U.S. at 359. The trial courts in the two cases that were consolidated in the *Rodrigue* appeal dismissed the state wrongful death claims, ruling that the federal statutory remedy was exclusive. *Id.* at 353–54. The Fifth Circuit affirmed that ruling, but the Supreme Court reversed. *Id.* at 355. The Supreme Court explained that the

---

[7] As explained in the Joint Report of the Committees on Commerce, Interior and Insular Affairs, and Public Works to the Senate, the Department of Justice sought the 1975 amendment to the OCSLA because, "from an enforcement point of view," it wanted the same law applied to all deepwater ports and structures erected on the OCS, *see* S. Rep. No. 93-1217, at 76 (1974), and "no provision was made in the Outer Continental Shelf Lands Act to apply State laws as adopted, amended or repealed, *after* the date of enactment of that Act." *Id*. at 60.

OCSLA requires fixed drilling platforms to be treated as artificial islands or federal enclaves within a landlocked state, not as vessels.  *Id.*  As such, "the [federal] admiralty action under the [High] Seas Act no more applies to these accidents actually occurring on the islands than it would to accidents occurring in an upland federal enclave."[8]  *Id.* at 366.  Moreover, since the accidents befalling the workers "involved no collision with a vessel, and the structures were not navigational aids," their deaths were not attributable to traditional maritime activity.  *Id.* at 360.  Hence, the High Seas Act's maritime remedy was unavailable, and "any obstacle to the application of state law by incorporation as federal law through [§ 1333(a)(2)]" was "remove[d]."  *Id.* at 366.

In reaching this result, *Rodrigue* first examined the language of § 1333(a)(2), which, as originally enacted, expressly incorporated then-existing state laws "[t]o the extent that they are applicable and not inconsistent" with federal law.  *See id.* at 356 n.3 (quoting 43 U.S.C. § 1333(a)(2)(A)).  The Supreme Court concluded from its analysis of the text that "federal law is 'exclusive' in its regulation of [the OCS], and that state law is adopted only as surrogate federal law."  *Id.* at 357.  From the Senate Committee Report, the Conference Report, and the debate on the floor of the Senate, the Court found support for "[t]he principles that federal law should prevail, and that state law

---

[8] "[A] state may not legislate with respect to a federal enclave unless it reserved the right to do so when the state gave its consent to the purchase by the United States[;] only state laws existing at the time of the acquisition remain enforceable.  Subsequent state laws are only enforceable if Congress provides for assimilation of later-enacted state controls."  3 William J. Rich, *Modern Constitutional Law* § 34:49 (3d ed. 2016).

should be applied only as federal law and then only when no inconsistent federal law applie[s]". *Id*. at 357–59 (citing S. Rep. No. 83-411, at 11 (1953); H.R. Conf. Rep. No. 1031, 83d Cong., 1st Sess., 12 (1953); 99 Cong. Rec. 6962–63, 7164, 7232–36 (1953)). "This legislative history buttresse[d] the Court of Appeals'[s] finding that in view of the inconsistencies between the state law and the [High] Seas Act, the [High] Seas Act remedy would be exclusive if it applied." *Id.* at 359.

But the High Seas Act remedy did not apply. The Supreme Court recounted that while introducing the OCSLA bill to the Senate, Senator Cordon explained that the Committee on Interior and Insular Affairs initially attempted to "provide housekeeping law" for the OCS by treating drilling platforms as vessels subject to maritime law. *Rodrigue*, 395 U.S. at 361 (quoting 99 Cong. Rec. 6963 (1953)). The Committee, however, eschewed this approach because "[t]he so-called social laws necessary for protection of the workers and their families would not apply[, including] such things as unemployment laws, industrial-accident laws, fair-labor-standard laws, and so forth. Ultimately, instead, the whole body of Federal law was made applicable to the area as well as state law where necessary." *Id.* at 362 (original alterations and quotation marks omitted). The *Rodrigue* court concluded from its "[c]areful scrutiny of the hearings which were the basis for eliminating from the [OCSLA] the treatment of artificial islands as vessels . . . that the motivation for this change, together with the adoption of state law as surrogate federal law, was the view that maritime law was inapposite to these fixed structures." *Id.* at 363. In sum, *Rodrigue* dispelled the misconception that maritime law applied perforce to drilling platforms on the outer Continental Shelf. Since federal law made no provision for wrongful

death claims on the OCS,[9] the Supreme Court held that the OCSLA adopted state law as the applicable surrogate federal law.  *Id*. at 365–66.

Notably, *Rodrigue* did not require the court to address a situation where state law *and* existing federal law made provisions for the type of claim asserted; no relevant federal cause of action for wrongful death existed.  *Rodrigue* is therefore of faint value for resolving a case like the instant one, where both state and federal law are potentially applicable to Newton's wage and hour grievances.

The Supreme Court revisited the OCSLA choice of law provision in *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971). Huson filed a personal injury suit against a non-employer defendant, Chevron, for damages arising from a back injury he suffered while working on Chevron's artificial island drilling rig on the outer Continental Shelf.  *Id.* at 98.  The parties' dispute centered on the timeliness of the plaintiff's claims.  *Id.*  The Fifth Circuit resorted to the federal admiralty doctrine of laches, but the Supreme Court reversed, holding that Louisiana's one-year statute of limitations should have controlled.[10]  *Id.* at 105.  The *Huson* court explained that in

---

[9] The Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901, *et seq.*, provides a federal remedy for a non-seaman maritime employee to recover against an employer for personal injuries. *See Figueroa v. Campbell Indus.*, 45 F.3d 311, 315 (9th Cir. 1995).  The OCSLA extends the LHWCA to the OCS, 43 U.S.C. § 1333(b), but defendants in *Rodrigue* were not the workers' employers.  *See Rodrigue*, 395 U.S. at 354.

[10] Because Huson initiated his action before the Supreme Court announced its decision in *Rodrigue*, the Court declined to apply this holding to his claims.  *Huson*, 404 U.S. at 99–100.

enacting the OCSLA, Congress expressed an intent for courts to fill "gaps" in existing federal law by applying state law, not by creating federal common law.  *Id*. at 104–05 (internal quotation marks omitted).  Like *Rodrigue*, *Huson* did not resolve a claimed inconsistency between potentially applicable state and federal laws.  Nor did *Offshore Logistics Inc. v. Tallentire*, 477 U.S. 207 (1986), which considered whether the High Seas Act or state law governed wrongful death actions brought after a helicopter transporting two OCS platform workers crashed into the sea.  *Id.* at 209.  Starting from the observation that the text of the OCSLA precludes its application to the high seas over the outer Continental Shelf, the Supreme Court rejected "the proposition that it is the decedent's status or his special relationship with the shore" that triggers OCSLA's choice of law provision in § 1333(a)(2)(A), "regardless of the location of the accident." *Id.* at 219.  Locale is key, and because "the fatalities underlying [the] suit . . . occurred on the high seas" rather than on the OCS, the High Seas Act—not the OCSLA—controlled.  *Id.* at 220.

Surveying the Supreme Court's OCSLA jurisprudence, we conclude that there are three questions that must be asked in any case involving choice of law under § 1333(a)(2)(A) of the OCSLA.  First, the threshold question is whether the situs of the controversy is the OCS.  *See Tallentire*, 477 U.S. at 218–19; *cf. Pac. Operators Offshore, LLP v. Valladolid*, 565 U.S. 207, 222 (2012) (holding that in contrast to § 1333(a)(2)(A), the OCSLA's provision for workers' compensation, § 1333(b), covers employees who can establish a "substantial-nexus" between their injury and extractive operations on the OCS).  If the situs is not the OCS, the OCSLA's choice of law provision cannot apply. *See Tallentire*, 477 U.S. at 220.  Second, if the situs is the

OCS, we then ask whether there is any federal law applicable to the dispute. *See Rodrigue*, 395 U.S. at 366. If there is not, then state law generally applies. *See id.*; *Huson*, 404 U.S. at 101. Third, if there is federal law applicable to the dispute, then we "must consider the content of both potentially applicable federal and state law" and ask whether any applicable state law is inconsistent with federal law. *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 486 (1981). As a contemporary commentator on the OCSLA presciently warned, "[w]hich state laws 'are applicable and not inconsistent' with federal laws and regulations will be open to constant interpretation and controversy." Christopher, *supra*, at 42.

The "seemingly innocuous extension of state law raised to the status of surrogate federal law raises extremely complex questions of interpretation[,]" particularly in addressing choice of law. 1 Thomas J. Shoenbaum, *Admiralty & Maritime Law* § 3-9 (5th ed. 2016). The Fifth Circuit has elaborated two strands of jurisprudence stemming from *Rodrigue*. According to the Fifth Circuit's *Continental Oil* line of cases, "the recurring theme of *Rodrigue* 'requires that "applicable" [state law] be read in terms of necessity—necessity to fill a significant void or gap'" in existing federal law. *Nations v. Morris*, 483 F.2d 577, 585 (5th Cir. 1973) (quoting *Cont'l Oil*, 417 F.2d at 1036). The Fifth Circuit last applied the *Continental Oil* test in 1985 in *LeSassier v. Chevron USA, Inc.*, 776 F.2d 506, 509 (5th Cir. 1985) (per curiam),[11] where the court considered whether a

---

[11] The *Continental Oil* test was also briefly alluded to in the footnotes of two later cases: *Oceanic Butler, Inc. v. Nordahl*, 842 F.2d 773, 777 n.4 (5th Cir. 1988) and *Mesa Operating Ltd. v. U.S. Dep't of Interior*, 931 F.2d 318, 325 n.48 (5th Cir. 1991).

drilling platform worker could maintain a Louisiana retaliatory discharge action even though the Longshore and Harbor Workers' Compensation Act (LHWCA) provides a federal remedy for retaliatory discharge.  LeSassier was a platform worker who had been injured on an outer Continental Shelf platform.  *LeSassier*, 776 F.2d at 507. After filing a successful claim for benefits under the LHWCA, LeSassier was fired.  *Id.*  He brought a state law action against his former employer alleging retaliatory discharge, but the district court concluded LeSassier could not rely on state retaliatory discharge law.  *Id.*  The Fifth Circuit affirmed, holding that "no gap" in federal law existed because "Congress provided a specific statutory provision [in the LHWCA] (33 U.S.C. § 948a) to address retaliatory discharges."  *Id.* at 509.  The court of appeals declined to "selectively apply[] only those parts of the overall LHWCA statutory structure which [LeSassier] happen[ed] to favor and ignore less favorable provisions." *Id.* at 508.  In Parker's view, *Continental Oil* and its progeny establishes that, at least in the Fifth Circuit, state law is only applicable on the OCS if it is necessary to resort to state law to fill a gap or void in federal law.  Parker urges us to adopt such a rule.

Newton advocates for the adoption of the *PLT* test as applied in the Fifth Circuit's more recent lines of cases.  The *PLT* test distills *Rodrigue* thus: "[F]or state law to apply as surrogate federal law, three conditions must be met:  '(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil seabed, or artificial structures permanently or temporarily attached thereto)[;] (2) Federal maritime law must not apply of its own force[;] (3) [t]he state law must not be inconsistent with Federal law.'" *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 783 (5th Cir. 2009) (en banc) (quoting *PLT*, 895 F.2d at 1047).  The Fifth Circuit

applied the third prong of this test in *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512 (5th Cir. 1996), *overruled on other grounds by Grand Isle Shipyard*, 589 F.3d at 788 n.8. *Hodgen* arose from an accident suffered by an operator while executing a swing rope transfer from a OCS platform to a vessel. 87 F.3d at 1516. The operator settled his personal injury claims against the defendants who then litigated questions of comparative fault and indemnity between themselves. *Id.* at 1517. An agreement between the operator's employer and the charterer contained a clause requiring the former to indemnify the latter for costs and damages, but the Louisiana Oilfield Indemnity Act (LOIA) forbade any such transfer of liability. *Id.* at 1522. The charterer argued that the LOIA should not be adopted as surrogate federal law because it was inconsistent with federal law. *Id.* at 1528. The Fifth Circuit, relying on its prior decision in *Knapp v. Chevron USA, Inc.*, 781 F.2d 1123 (5th Cir. 1986), summarily rebuffed this contention. *Hodgen*, 87 F.3d at 1528. *Knapp* concluded that because the 1984 amendments to the LHWCA were silent as to indemnity agreements addressing injuries caused by the negligence of non-vessels and nothing signaled Congress's intent that the amendments should "preempt the field," Louisiana's Oilfield Indemnity Act was not inconsistent with federal law and, therefore, the OCSLA "makes [the LOIA] the applicable surrogate law on fixed platforms offshore Louisiana." *Knapp*, 781 F.2d at 1131. *Hodgen* and *Knapp* suggest that the Fifth Circuit's *PLT* test looks to congressional intent regarding preemption to determine whether state law is inconsistent with a federal statutory scheme.

It remains unclear whether the *PLT* test has superseded the *Continental Oil* test in the Fifth Circuit, or whether the Fifth Circuit views the *Continental Oil* test as a precursor to

the *PLT* test, such that the *PLT* conditions come into play only if there is a significant gap or void in federal law.  *See Tetra Techs., Inc. v. Cont'l Ins. Co.*, 814 F.3d 733, 738 (5th Cir. 2016).  Despite questions about the *PLT* test, in respects not here pertinent,[12] Newton argues that the *PLT* test should be adopted as the law of the Ninth Circuit.

## B.  The Instant Case

### 1.  Newton's Claims under California Minimum Wage and Overtime Law

Parker paid Newton an hourly rate well above the state and federal minimum wage, and also paid him premium rates for overtime hours.  Newton's principal wage and hour objection is that he was not properly compensated for standby hours on the drilling platform.  We know of no appellate case law examining whether, for the purposes of the OCSLA, state wage and hour laws are inconsistent with the federal Fair Labor Standards Act.[13]

---

[12] *See Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 214 (5th Cir. 2013) (Clement, J., writing for himself) ("Although the application of maritime law under OCSLA may be contrary to the intention of Congress, we are bound by our precedent to apply maritime law as the substantive rule of decision where it otherwise applies 'of its own force.'"); *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 505 n.2 (5th Cir. 2002) (DeMoss, J., dissenting) (noting that "there is no statutory basis" for examining whether maritime law applies of its own force under the second prong of the *PLT* test), *overruled on other grounds by Grand Isle Shipyard*, 589 F.3d at 788 n.8.

[13] District courts within the Ninth Circuit have considered whether California wage and hour laws apply as surrogate federal law on the OCS. *See, e.g.*, *Williams v. Brinderson Constructors Inc.*, No. CV 15-2474-MWF(AGRx), 2015 WL 4747892 (C.D. Cal. Aug. 11, 2015); *Reyna v.*

### a.  Text and Legislative History of the OCSLA

To resolve the issue of first impression presented by Newton's appeal, "[w]e start, as we must, with the language of the statute[,]" *Bailey v. United States*, 516 U.S. 137, 144 (1995).  "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (internal quotation marks omitted).

The OCSLA makes the laws of the adjacent state, "[t]o the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws . . . the law of the United States."  43 U.S.C. § 1333(a)(2)(A).  "[W]ords used in a statute are to be given their ordinary meaning in the absence of persuasive reasons to the contrary."  *Burns v. Alcala*, 420 U.S. 575, 580 (1975).  In its *ordinary* sense, "applicable" state law, as that term was employed in the 1953 version of the statute, meant the non-tax law of the abutting state—frozen in time—that pertained to the subject matter at hand.  *See, e.g.*, *Applicable*, Funk & Wagnalls Standard Dictionary of the English Language (1958) ("Capable of or suitable for application; relevant; fitting").  The 1975 amendment to the OCSLA did not change the significance of the word "applicable," except that the state laws to be

---

*Venoco, Inc.*, No. CV 15-4525 PA (RAOx) (C.D. Cal. October 23, 2015); *Espinoza v. Beta Operating Co.*, No. CV 15-04659-RGK (ASx) (C.D. Cal. Oct. 29, 2015); *Jefferson v. Beta Operating Co.*, No. CV 15-04966 SJO (PLAx) (C.D. Cal. Nov. 3, 2015); *Garcia v. Freeport-McMoran Oil & Gas LLC*, No. CV 16-4320-R (C.D. Cal. Sept. 16, 2016).  Except where parties contractually agreed for state law to control, these district courts concluded that California's wage and hour laws do not extend to OCS platform workers because the FLSA leaves no gap for state law to fill.

adopted became "the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed." 43 U.S.C. § 1333(a)(2)(A); *see, e.g.*, *Applicable*, Webster's New World Dictionary of the American Language (1972) ("that can be applied; appropriate"). Thus, we first observe that the "ordinary, contemporary, common meaning," *Williams v. Taylor*, 529 U.S. 420, 431 (2000), of "applicable" does not lend itself to the notion that state laws have to fill a gap in federal law to qualify as surrogate federal law.

Moreover, we generally "presume [that] Congress says what it means and means what it says." *Simmons v. Himmelreich*, 136 S. Ct. 1843, 1848 (2016). Congress could have said "necessary," or employed words to that effect, in § 1333(a)(2)(A). In another statute, Congress authorized the courts to borrow state common law where "the laws of the United States . . . are not adapted to the object [of the applicable federal statutes], or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law[.]" 42 U.S.C. § 1988(a). Congress did not make any such qualification here.

Legislative history, however pellucid, cannot rewrite the language of a statute, *Am. Rivers v. FERC*, 201 F.3d 1186, 1204 (9th Cir. 1999), but "clear evidence of congressional intent may illuminate ambiguous text." *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011).

The Fifth Circuit in *Continental Oil* navigated OCSLA's choppy waters by taking legislative history as its lodestar. 417 F.2d at 1034–36. *Continental Oil* noted the "deep political and emotional currents centered around the clash between national sovereignty and states' rights" during the passage of the OCSLA and Congress's "express reject[ion]"

of the "notion of supremacy of state law administered by state agencies." *Id.* at 1036.  The Fifth Circuit concluded that "the deliberate choice of federal law, federally administered, requires that 'applicable' be read in terms of necessity—necessity to fill a significant void or gap." *Id.* (footnote omitted).

The legislative history indicates that Congress was solicitous to retain and indeed, assert, the federal government's civil and political jurisdiction over the OCS, but we are not persuaded that this consideration justifies judicial substitution of "necessary" for the actual statutory term, "applicable." These two terms are manifestly different, and the latter does not connote the former.  The OCSLA commands us to give force to "applicable and not inconsistent" state laws as surrogate federal law.  43 U.S.C. § 1333(a)(2)(A).  By following the course charted by the OCSLA, we do not accord state law supremacy over federal law, nor cede the United States' jurisdiction over the OCS to state agencies.  We simply acknowledge, as the Supreme Court did in *Rodrigue*, 395 U.S. at 355–56, that Congress adopted state law as surrogate federal law for the OCS, so long as it is "applicable and not inconsistent with" existing federal law.

Nor do we find in the legislative history a clear intent on the part of Congress to require a "significant void or gap" in federal legislation or regulation, meaning the complete absence of any federal law, as a prerequisite to the application of state law.  Indeed, Senator Cordon, the floor manager of the bill, noted that the contemplated extension of admiralty law to the OCS was unsatisfactory because:

> The so-called social laws necessary for protection of the workers and their families would not apply. I refer to such things as unemployment laws, industrial-accident laws, fair-labor-standard laws, and so forth. It was necessary that the protection afforded by such laws be extended to the outer Shelf area because of the fact that ultimately some 10,000 or more men might be employed in mineral-resource development there.

99 Cong. Rec. 6963 (1953); *see Rodrigue*, 395 U.S. at 362. Read in context, Senator Cordon's statements emphasized the importance of having state law apply to the OCS, and do not indicate that state laws had to be necessary to fill gaps or voids in federal law *before* they would be adopted as surrogate federal law. *See Rodrigue*, 395 U.S. at 363. As Senator Cordon went on to explain:

> [T]he legal situation [of the OCS] is comparable to that in areas owned by the Federal Government under the exclusive jurisdiction of the Federal Government and lying within the boundaries of a State in the uplands.
>
> As a part of the same amendment, the [Senate Committee on Interior and Insular Affairs] provided, first, that the laws of abutting States should become a part of the Federal law within such areas opposite the States as would have been included in the States were their boundaries extended to the edge of the Continental Shelf.

. . . .

> The outer Continental Shelf will have the
> protection of the Constitution itself, *and will
> have the protection and provision for conduct
> of affairs as given by the laws of each of the
> abutting States* within the area immediately
> opposite that State.

99 Cong. Rec. 6963–64 (1953) (emphasis added); *see* S. Rep.
No. 83-411, at 11 (1953).

Read in isolation, some remarks by Senators Anderson
and Long seem to endorse the idea that state law was to speak
as federal law only where existing federal law was "silent" or
otherwise left a "void." 99 Cong. Rec. 7257, 7164 (1953).
But "scattered floor statements by individual lawmakers . . .
[are] 'among the least illuminating forms of legislative
history.'" *Advocate Health Care Network v. Stapleton*,
137 S. Ct. 1652, 1661 (2017) (quoting *NLRB. v. SW General,
Inc.*, 137 S. Ct. 929, 943 (2017)); *see Shell Oil*, 488 U.S. at 29
("We . . . find that Shell's reliance on an isolated statement by
Senator Long," who was a "vocal opponent of the OCSLA,"
"is misplaced."); *see also Hertzberg v. Dignity Partners, Inc.*,
191 F.3d 1076, 1082 (9th Cir. 1999) ("This circuit relies on
official committee reports when considering legislative
history, not stray comments by individuals . . . ."). Here, the
legislative history is at best muddled, as illustrated by the
following exchange between Senator Cordon, the floor
manager of the bill, and Senator Daniel:

> Mr. DANIEL: . . . *Since we have applied
> State laws in the fields which are not covered
> by Federal laws or by regulations* of the

Secretary of the Interior, I should like to ask the Senator from Oregon whether he understands that State laws relating to conservation will apply in this area until and unless the Secretary of the Interior writes some rule or regulation to the contrary.

Mr. CORDON:  There can be no question about that; the Senator's statement is correct. *The language clearly adopts State law as Federal law where it is not inconsistent with existing Federal law or with the rules and regulations of the Secretary of the Interior*: and, of necessity, the inconsistency with respect to rules and regulations of the Secretary of the Interior must be in the case of those rules and regulations which it is within the power of the Secretary of the Interior to adopt.

When he has adopted them, those rules and regulations *must be inconsistent with or in conflict* with the conservation laws of the States, which are then the conservation laws of the United States with respect to that particular area, *or else the laws of the States, having been adopted by the United States, apply to that area.*  There can be no question about it.

99 Cong. Rec. 7264 (1953) (emphasis added).  We cannot allow "ambiguous legislative history . . . to control the ordinary meaning of [the] statutory language."  *League to Save Lake Tahoe, Inc. v. Trounday*, 598 F.2d 1164, 1172 (9th

Cir. 1979) (citing *NLRB v. Plasterer's Local No. 79*, 404 U.S. 116, 129–30 (1971)); *see Milner*, 562 U.S. at 572.  Reading the plain text of the OCSLA against the background of its inconclusive legislative history, we are not convinced that state law applies as surrogate federal law on the OCS only if "necess[ary]," *Cont'l Oil*, 417 F.2d at 1036, in the sense that there is no existing federal law on the subject.

We do not understand the Supreme Court to have instructed otherwise.  Although the Fifth Circuit has sometimes described "necessity to fill a significant void or gap" as the "recurring theme of *Rodrigue*," *Nations*, 483 F.2d at 585 (internal quotation marks omitted); *Cont'l Oil*, 417 F.2d at 1036, the issue actually decided by *Rodrigue* was whether federal admiralty law applied on OCS platforms, 395 U.S. at 360, 366.  *Rodrigue* established that, absent a maritime nexus, federal admiralty law does not extend to the OCS.  *Id.* at 359–60.  State law was deemed the law governing the two wrongful death actions in *Rodrigue*, but there was no competing applicable federal law, *id.* at 366, and the Supreme Court has not yet squarely confronted a situation where, as here, a state statutory scheme and an existing federal statutory scheme are both "potentially applicable" to a civil suit arising on the OCS.  *Cf. Gulf Offshore*, 453 U.S. at 486–87.

### b.  The Meaning of "Not Inconsistent"

As we see it, because there are California and federal statutory schemes that are "applicable," in the ordinary sense of that term, to the parties' conflict, the determinative question in Newton's case is not which law is "applicable," but whether California wage and hour laws are "inconsistent with" existing federal law.  43 U.S.C. § 1333(a)(2)(A).  If

they are not inconsistent, the OCSLA dictates that state wage and hour grievances should be redressable as federal claims on the OCS.

We recently examined the usual meaning of "inconsistent" in *Ecological Rights Foundation v. Pacific Gas & Electricity Co.*, 874 F.3d 1083 (9th Cir. 2017), where we concluded that laws are inconsistent if they are mutually "incompatible, incongruous, [or] inharmonious." *Id.* at 1095 (quoting Webster's Third New International Dictionary (1971)).[14]

To further articulate a framework for deciding whether a state law is inconsistent with federal law under the OCSLA, we draw on cases that have arisen in the context of two statutes involving the incorporation of state law into federal law: (1) the Assimilative Crimes Act ("Crimes Act"), 18 U.S.C. § 13, and (2) 42 U.S.C. § 1988. We look to the Crimes Act because it is an example of Congress applying state law in conjunction with federal law on enclaves. We also consider 42 U.S.C. § 1988, because at the time Congress enacted the civil rights statutes, it recognized that federal civil rights law was not sufficiently comprehensive and would have to rely, in part, on state law to effectuate its objectives. *See Burnett v. Grattan*, 468 U.S. 42, 47 (1984). Similar to § 1333(a)(2)(A) of the OCSLA, 42 U.S.C. § 1988 conditions the incorporation of state law on it being "not inconsistent with the Constitution and laws of the United States."

In *Rodrigue*, the Supreme Court emphasized that drilling platforms on the OCS are "to be treated as island[s] or as

---

[14] *Ecological Rights Foundation* involved inconsistency between federal statutes. 847 F.3d at 1095.

federal enclaves within a landlocked State, not as vessels." 395 U.S. at 361.  "The central principle of federal enclave doctrine is that Congress has exclusive legislative authority over . . . enclaves.  But in the absence of applicable federal legislation displacing state law, those state laws that existed at the time that the enclave was ceded to the federal government remain in force."  *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1237 (10th Cir. 2012).  State law post-dating the creation of the enclave, however, is federal law on the enclave only if Congress so directs.  *Id.*

The Assimilative Crimes Act is one such directive.[15] "The [Crimes Act] applies state criminal law to a defendant's acts or omissions [in federal enclaves] that are not made punishable by any enactment of Congress."  *Lewis v. United States*, 523 U.S. 155, 159 (1998) (emphasis and internal quotation marks omitted).  Its "basic purpose is one of borrowing state law to fill gaps in the federal criminal law that applies on federal enclaves."  *Id.* at 160.  But as we have recognized, the Supreme Court has held that a void or gap—in the sense of a total absence of applicable federal law—is not a prerequisite to the application of state law under the Crimes Act.  *See, e.g.*, *United States v. Reed*, 734 F.3d 881, 888 (9th Cir. 2013) (citing *Lewis*, 523 U.S. at 166).

In *Lewis*, the Supreme Court formulated a two-step test for whether state law applies to a defendant accused of

---

[15] 18 U.S.C. § 13(a), the Crimes Act, provides:  "Whoever within or upon any [federal enclave] . . . is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State . . . in which such place is situated, . . . shall be guilty of a like offense and subject to a like punishment."

committing an offense on an enclave.  523 U.S. at 164–65.
The first question is the statutory one: whether the
defendant's act or omission has been made punishable by any
enactment of Congress.  *Id.* at 164.  If the act is not
punishable by federal law, then the Crimes Act presumptively
assimilates state law.  *Id.*  If Congress has legislated to make
the defendant's conduct punishable, then "the court must ask
the further question whether the federal statutes that apply to
the 'act or omission' *preclude* application of the state law in
question," that is, whether "applicable federal law indicate[s]
an intent to punish conduct such as the defendant's to the
exclusion of the particular state statute at issue?"  *Id.* at 164,
166 (emphasis added).  There is no "touchstone to provide an
automatic general answer to this second question," and the
"primary question . . . is one of legislative intent . . . ."  *Id.* at
165–66.

*Reed* employed *Lewis*'s two-step test to hold that a federal
DUI regulation did not bar assimilation of a Nevada drugged
driving statute.  734 F.3d at 893.  Reed was caught speeding
in Lake Mead National Recreation Area.  *Id.* at 884.  He
admitted to smoking marijuana and imbibing alcohol while
driving, and failed three of the four field sobriety tests
subsequently administered.  *Id.*  Reed was charged, *inter alia*,
under a Nevada statute that penalized the operation of a
vehicle while the concentration of marijuana in the operator's
blood exceeded a statutorily established limit.  Nev. Rev.
Stat. § 484C.110(3)(g).  Above that limit, a violation of the
statute was established *per se*, i.e., without regard to actual
impairment.

Reed moved to dismiss the state charge, arguing that
Nevada's *per se* drugged driving law did not apply on the
federal enclave where he was stopped because a federal

regulation, 36 C.F.R. § 4.23(a)(1), also "prohibit[ed] operating a vehicle while under the influence of alcohol *or* drugs to a degree that renders the operator incapable of safe operation." *Id.* at 886. In other words, Reed argued that because federal law made his conduct punishable, there was no gap in federal law for state law to fill. After a magistrate judge denied Reed's motion to dismiss, Reed pleaded guilty to the state law crime and appealed to our court. *Id.* at 884.

Applying the first step of the *Lewis* test, we agreed with the trial court that the federal enactment punished Reed's conduct. *Id.* at 887. But at step two, we concluded that federal law did not preclude application of the Nevada statute. *Id.* at 888. We noted that there is no "automatic general answer" to *Lewis*'s second question and that the primary inquiry is one of legislative intent. *Id.* Although "a state statute will not be assimilated if, for example, (1) its application would conflict with federal policy; (2) it would effectively rewrite an offense definition that Congress carefully considered; or (3) the federal statutes reveal an intent to occupy so much of a field as to exclude use of the particular state statute," we concluded that "the mere presence of the federal DUI regulation [did] not manifest a federal policy against assimilating Nevada's per se drugged driving law . . . ." *Id.* at 888, 892. *Reed* observed that federal law only included a *per se* provision for alcohol; it did not punish those who operated a vehicle under the influence of marijuana absent actual impairment. *Id*. at 886 (citing 36 C.F.R. § 4.23(a)(1)). Further, by providing elsewhere in the federal regulations that "State law that is now or may later be in effect is adopted and made a part of the regulations . . . [,]" 36 C.F.R. § 4.2, the National Park Service clearly expressed its intent for all nonconflicting state traffic laws to apply on federal enclaves. *Id.* at 889. Finding "no indication of an

overriding federal policy with which Nevada's per se drugged driving law interferes," we affirmed Reed's convictions. *Id.* at 893.

Although Congress has never provided for the wholesale assimilation of state civil law into federal law on all federal enclaves, it has the authority to do so, and it has done so for the OCS, "an area of exclusive Federal jurisdiction." 43 U.S.C. § 1333(a)(1). In legislating for the OCS, Congress used more precise language than in the Crimes Act, specifying that applicable state law is to apply unless "inconsistent" with federal law. *Reed*, however, remains instructive in two ways. First, it reinforces that where Congress has provided for the assimilation of state law into federal law governing a federal enclave, the "mere presence" of federal law is not enough to prevent application of state law. *Reed*, 734 F.3d at 892. Second, it illustrates the principle that determining whether the presence of federal law precludes the application of state law on an enclave is primarily a question of congressional intent. *Id.* at 888–89 (citing *Lewis*, 523 U.S. at 166); *see also United States v. Souza*, 392 F.3d 1050, 1054 (9th Cir. 2004). In *Reed*, there was not only considerable overlap between the federal and state DUI laws, but Reed's conduct was actually criminalized by existing federal law. Nevertheless, assimilating Nevada's drugged driving law was entirely consistent with federal law and policy, as the overlapping federal regulation expressly contemplated "assimilation of all nonconflicting state traffic laws." 734 F.3d at 888.

We draw a similar lesson from the jurisprudence pertaining to 42 U.S.C. § 1988(a).[16]  Notably, § 1988(a) does use the term "inconsistent."   But unlike the OCSLA, it requires, before the assimilation of state law, not simply that the state law be "not inconsistent with the Constitution and laws of the United States," but that "the laws of the United States [be] . . . not adapted to the object, or . . . deficient in the provisions necessary to furnish suitable remedies and punish offenses against [the] law . . . ."  42 U.S.C. § 1988(a). In other words, unlike the OCSLA, § 1988 does require a gap in federal law as a prerequisite for assimilation of state law. Taking that substantial difference into account, judicial interpretation of the term "not inconsistent" in § 1988(a) remains instructive here.  In enacting the federal civil rights acts, Congress recognized that federal law would not contain every rule that may be required to adjudicate suits brought under them.  *Burnett*, 468 U.S. at 47.  Accordingly, in § 1988(a), "Congress determined that gaps in [the] federal civil rights acts should be filled by state law, as long as that law is not inconsistent with federal law."  *Hardin v. Straub*, 490 U.S. 536, 538 (1989) (footnote omitted).  The Supreme Court has explained that "[i]n resolving questions of inconsistency between state and federal law raised under § 1988, courts must look not only at particular federal statutes and constitutional provisions, but also at the policies

---

[16] 42 U.S.C. § 1988(a) provides that in the event that the federal civil rights acts "are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, *so far as the same is not inconsistent with the Constitution and laws of the United States*, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty." (emphasis added.)

expressed in them." *Robertson v. Wegmann*, 436 U.S. 584, 590 (1978) (alteration and internal quotation marks omitted).

An example of inconsistency between state and federal law is illustrated by *Burnett*. 468 U.S. at 55. Plaintiffs in *Burnett* were white employees of a predominantly black college who sued their employer for racial and gender discrimination after it refused to renew their contracts. *Id.* at 43–44. The district court borrowed the six-month statute of limitations for filing an employment discrimination complaint with the relevant Maryland administrative body, and dismissed the action. *Id.* at 45. The Fourth Circuit reversed, holding that Maryland's generic three-year statute of limitations applied, *id.* at 45–46, and the Supreme Court affirmed the Fourth Circuit's decision. *Id.* at 46. The Supreme Court observed that "[a] legislative definition of a statute of limitations also reflects a policy assessment of the state causes of action to which it applies." *Id.* at 52. Hence, insofar as state policies are "inconsistent with, or of marginal relevance to, the policies informing the Civil Rights Acts," their accompanying statutes of limitations may be unsuitable for use under § 1988(a). *Id.* at 53. Contrasting the broad remedial goals of the federal civil rights statutes—"compensation of persons whose civil rights have been violated, and prevention of the abuse of state power"—to the relatively modest ambitions of Maryland's administrative scheme for employment discrimination, the *Burnett* court found Maryland's policy to be "manifestly inconsistent with the central objective of the Reconstruction-Era civil rights statutes, which is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive relief." *Id.* at 53–55.

While § 1988(a) is not textually parallel to § 1333(a)(2)(A) of the OCSLA, we glean from *Burnett* and similar cases, *see, e.g.*, *Board of Regents v. Tomanio*, 446 U.S. 478 (1980), the principle that inconsistency between state and federal law is assessed by looking at Congress's objective in enacting the federal statutes at issue.

### c. Whether California Minimum Wage and Overtime Laws are Inconsistent with Federal Law

We thus turn to the remaining question and the crux of Newton's appeal: whether California's minimum wage and overtime laws are inconsistent with the FLSA.

The FLSA was enacted to "protect all covered workers from substandard wages and oppressive working hours." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2121 (2016) (internal quotation marks omitted). It "seeks to prohibit 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'" *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11 (2011) (quoting 29 U.S.C. § 202(a)). Critical to our analysis, the FLSA "establish[es] a national *floor* under which wage protections cannot drop." *Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1425 (9th Cir. 1990); *see Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 759 (9th Cir. 2010) ("[T]he FLSA sets a floor rather than a ceiling on protective legislation."), *vacated on other grounds*, *Chinese Daily News, Inc. v. Wang*, 565 U.S. 801 (2011). The FLSA's savings clause expressly provides that states are free to adopt more protective standards for minimum wages or maximum hours in a work week:

> No provision of this chapter or of any order
> thereunder shall excuse noncompliance with
> any Federal or State law or municipal
> ordinance establishing a minimum wage
> higher than the minimum wage established
> under this chapter or a maximum work week
> lower than the maximum workweek
> established under this chapter.

29 U.S.C. § 218(a).  Since "the best evidence of Congress's
intent is the statutory text," *Nat'l Fed'n of Indep. Bus. v.
Sebelius*, 567 U.S. 519, 544 (2012), and the FLSA explicitly
permits more protective state wage and hour laws, we reject
Parker's suggestion that California's minimum wage and
overtime laws are antagonistic to the remedial purposes of the
FLSA simply because they establish different and more
generous benchmarks than the floor set by the FLSA's
statutory and regulatory scheme.[17]

Moreover, the application of California minimum wage
and overtime laws as federal law on the OCS serves the
purpose of the OCSLA.  In *Huson*, the Supreme Court
observed that "Congress . . . recognized that the special

---

[17] Newton asserts that "inconsistency with regulations promulgated
by departments other than the Department of the Interior does not bar the
application of the state law" on the OCS.  As a general matter, "properly
promulgated, substantive agency regulations have 'the force and effect of
law'" such as "to pre-empt state law under the Supremacy Clause."
*Chrysler Corp. v. Brown*, 441 U.S. 281, 295–96 (1979); *see Wyeth v.
Levine*, 555 U.S. 555, 576 (2009).  We have "turned to these longstanding
DOL regulations in resolving FLSA . . . disputes." *Brigham v. Eugene
Water & Elec. Bd.*, 357 F.3d 931, 940 (2004).  The OCSLA does not
preclude courts from looking beyond the bare text of the FLSA to DOL
regulations for illumination as to the content of existing federal law.

relationship between the men working on these artificial islands and the adjacent shore to which they commute favored application of state law with which these men and their attorneys would be familiar." 404 U.S. at 103 (internal quotation marks omitted).   Application of California's minimum wage and "hours worked" provisions does not vitiate the "special relationship between the men working on these [platforms] and the adjacent shore to which they commute to visit their families," *Rodrigue*, 395 U.S. at 365; if anything, this policy consideration indicates that the overlapping state and federal statutory schemes regulating employment on the California shore should also govern, as federal law, on the OCS.[18]  Application of California's wage and hour laws also does not frustrate an interest in national uniformity, because in enacting OCSLA, Congress "specifically rejected national uniformity as a paramount goal." *Gulf Offshore*, 453 U.S. at 487 (quoting *Huson*, 404 U.S. at 104) (internal quotation marks omitted).

Parker cites numerous cases for its contention that the FLSA is inconsistent with California's minimum wage and overtime laws.  In particular, Parker relies on *Mendiola v. CPS Security Solutions, Inc.*, 60 Cal. 4th 833 (2015). *Mendiola* involved California wage and hour claims brought by security guards who regularly patrolled construction sites for eight hours on weekdays and sixteen hours on weekends, and who were required to reside, uncompensated, in an employer-provided trailer for eight hours after each shift and

---

[18] To be clear, this "special relationship with the shore community," alone, does not support claims brought pursuant to § 1333(a)(2)(A) of the OCSLA "regardless of the location of the accident."  *See Tallentire*, 477 U.S. at 218–19.  This policy consideration only applies for grievances that arise on the OCS.  *Id.*

remain on-call. 60 Cal. 4th at 837. The *Mendiola* court held that these on-call hours were "hours worked" for the purposes of California's Wage Order 4, and that the employer "could not exclude 'sleep time'" from the compensable hours in the security guards' 24-hour shifts. *Id.* at 838. In reaching this result, the California Supreme Court rejected the employer's argument that federal DOL regulations furnished the appropriate definition for hours worked under California's wage order. *Id.* at 842–44. Emphasizing that it had previously "cautioned against confounding federal and state labor law," the California Supreme Court ruled that the language of Wage Order 4 did not evidence the state Industrial Welfare Commission's intent to incorporate, by reference, federal law and regulations. *Id.* at 843, 847 (internal quotation marks omitted). Parker argues that *Mendiola* illustrates that California law is inconsistent with the FLSA. *See Brigham*, 357 F.3d at 940–41. We disagree. *Mendiola* only establishes that California embraces a more protective standard for determining hours worked, not that California's standard is *inconsistent* with federal law. Indeed, the savings clause in the FLSA reflects Congress's express intent that states should be allowed to adopt more protective standards. *See* 29 U.S.C. § 218(a). Parker has failed to demonstrate that California's minimum wage and overtime laws are inconsistent with federal law, and we know of nothing else indicating that California's provisions for minimum wage and maximum hours worked are inconsistent with the FLSA.

We conclude the district court erred by dismissing the claims Newton brought pursuant to California's minimum wage and overtime laws, and that California's minimum wage and maximum hours worked provisions are "applicable and not inconsistent," 43 U.S.C. § 1333(a)(2)(A), with the

FLSA.  We vacate the order dismissing these claims and remand to the district court.

### 2.  Newton's Claims under California Meal Period, Final Pay, and Pay Stub Laws

The district court dismissed the claims Newton brought pursuant to California's meal period, final pay, and pay stub laws because it concluded that state law does not apply on the OCS unless there is a "significant void or gap" in federal law, and it found that there were no such voids or gaps.  In reaching this ruling, the district court relied on its conclusion that the FLSA is a comprehensive scheme, rather than considering whether California's wage and hour laws are inconsistent with the FLSA.  Because we hold that the absence of federal law is not a prerequisite for applicable and not inconsistent state law to become surrogate federal law on the OCS, we vacate the order dismissing these claims.  The district court shall determine on remand whether California's meal period, final pay, and pay stub laws are "not inconsistent" with existing federal law.  If they are, the OCSLA adopts them as federal law on the OCS.

### 3.  Newton's Civil Penalties and Unfair Competition Claims

Newton's claims under California's Private Attorney General Act (PAGA) and Unfair Competition Law (UCL) were dismissed by the district court on the grounds that he had not demonstrated a violation of California's labor and employment laws.  Because we vacate the dismissal of Newton's other claims under California law, we also vacate the dismissal of his PAGA and UCL claims.

40      NEWTON V. PARKER DRILLING MGMT. SERVS.

## 4.  Leave to Amend

Newton's operative complaint suggests that some of Parker's allegedly unlawful conduct occurred in California. We cannot determine on the record before us whether Newton has any claim arising from the time he spent onshore or within California's territorial waters.  This portion of the complaint is cryptic and it has not been addressed by the district court.  Under our precedent, Newton is entitled to an opportunity to clarify these claims.  *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (observing that the rule that leave to amend shall be "freely given" is "to be applied with extreme liberality") (citing *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001)).

## IV.  CONCLUSION

We vacate the order dismissing Newton's claims and remand to the district court for further proceedings consistent with this opinion.

## VACATED and REMANDED.